# In the United States Court of Appeals for the Sixth Circuit

ERIC S. SMITH,

*Petitioner,*

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Respondent,*

AND

FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.

*Intervenor.*

————————

On Petition for Review of an Order of the Securities and Exchange
Commission, SEC Admin. Proc. File No. 3-20127,
SEC Exchange Act Release No. 100762

————————

## Petitioner's Opening Brief

————————

Oral Argument Requested

Robert Knuts
GUNGNIR LAW PLLC
P.O. Box 150
Greenport, NY 11944
(631) 477-6300
rknuts@gungnirlaw.com
*Counsel for Petitioner*

March 26, 2025

Russell G. Ryan
Daniel Kelly
Mark Chenoweth
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Drive,
Suite 300
Arlington, VA 22203
(202) 869-5210
russ.ryan@ncla.legal
*Counsel for Petitioner*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Sixth Circuit Rule 26.1, the undersigned counsel states that Petitioner Eric S. Smith is a natural person, meaning that he has no parent corporations, and no publicly held corporation owns 10 percent or more of his stock.

*/s/ Russell G. Ryan*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF CONTENTS ...........................................................ii

TABLE OF AUTHORITIES......................................................iv

STATEMENT REGARDING ORAL ARGUMENT ..............................vii

STATEMENT OF JURISDICTION ............................................1

STATEMENT OF ISSUES......................................................3

STATEMENT OF THE CASE ..................................................4

STANDARD OF REVIEW.......................................................9

SUMMARY OF THE ARGUMENT .........................................9

ARGUMENT .........................................................................11

   I.   FINRA HAS NO LAWFUL AUTHORITY OVER SMITH........................11

      A.   FINRA Is a Private Organization Exercising Government Power in This Enforcement Action ................11

          1.   FINRA Is a Private Organization ..................................12

          2.   FINRA Claims Non-Private Authority for Itself ...........15

          3.   FINRA's Claimed Authority over Smith Is Governmental, Not Private...........................................17

      B.   FINRA's Enforcement Action Against Smith Violated the Private Nondelegation Doctrine....................................22

   II.   THE FINRA AND NAC HEARING OFFICERS WERE UNCONSTITUTIONALLY APPOINTED AND RETAINED ........................32

      A.   None of the Hearing Officers Was Properly Appointed .......33

      B.   None of the FINRA Adjudicators Is Properly Accountable to the President.................................................40

   III.   THIS ENFORCEMENT ACTION VIOLATES BOTH THE SEVENTH AMENDMENT AND THE ARTICLE III VESTING CLAUSE....................44

      A.   Smith Was Entitled to a Jury ..............................................44

      B.   This Case Required an Article III Forum.............................52

1. The Necessity of Adjudication in an Independent Branch of Government ................................................... 53

2. Smith's Case Is Categorically Exempt from the Public Rights Doctrine ................................................... 56

3. None of the Public Rights Exceptions Encompasses Smith's Case ................................................................ 59

CONCLUSION ........................................................................ 62

DESIGNATION OF RELEVANT AGENCY DOCUMENTS ................. 63

CERTIFICATE OF COMPLIANCE ......................................... 65

CERTIFICATE OF SERVICE................................................. 65

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alpine Sec. Corp. v. FINRA*,
121 F.4th 1314 (D.C. Cir. 2024)................................................. passim

*Axon Enter., Inc. v. FTC* and *SEC v. Cochran*,
598 U.S. 175 (2023) ...................................................................3

*Birkelbach v. SEC*,
751 F.3d 472 (7th Cir. 2014) .....................................................13

*Bowsher v. Synar*,
478 U.S. 714 (1986).................................................................25

*Calcutt v. FDIC*,
37 F.4th 293 (6th Cir. 2022) ......................................................3

*Carter v. Carter Coal Co.*,
298 U.S. 238 (1936).................................................................24

*Cmty. for Creative Non-Violence v. Pierce*,
786 F.2d 1199 (D.C. Cir. 1986) .................................................19

*Dep't of Transp. v. Ass'n of Am. Railroads*,
575 U.S. 43 (2015)...................................................................24

*First Jersey Sec., Inc. v. Bergen*,
605 F.2d 690 (3d Cir. 1979) ......................................................28

*Free Enter. Fund v. PCAOB*,
561 U.S. 477 (2010).....................................................3, 41, 42

*Freytag v. Comm'r*,
501 U.S. 868 (1991).................................................................31

*Graham v. SEC*,
222 F.3d 994 (D.C. Cir. 2000) ....................................................9

*Harman v. Forssenius*,
380 U.S. 528 (1965).................................................................43

*In re Aiken Cnty.*,
725 F.3d 255 (D.C. Cir. 2013) .....................................19, 20, 30

*Jarkesy v. SEC,*
    34 F.4th 446 (5th Cir. 2022) ............................................................ 43

*Katz v. SEC,*
    647 F.3d 1156 (D.C. Cir. 2011) ............................................................ 9

*Lucia v. SEC,*
    585 U.S. 237 (2018) ............................................................ 31, 36, 37

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black,*
    53 F.4th 869 (5th Cir. 2022) .................................................... 25, 26, 27

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982) ............................................................ 23

*Oklahoma v. United States,*
    62 F.4th 221 (6th Cir. 2023) .................................................... 26, 29

*Pittston Co. v. United States,*
    368 F.3d 385 (4th Cir. 2004) ............................................................ 21

*R. H. Johnson & Co. v. SEC,*
    198 F.2d 690 (2d Cir. 1952) ............................................................ 28

*SEC v. Jarkesy,*
    603 U.S. 109 (2024) ............................................................ passim

*Seila Law LLC v. CFPB,*
    591 U.S. 197 (2020) ............................................................ 35

*Sorrell v. SEC,*
    679 F.2d 1323 (9th Cir. 1982) ............................................................ 28

*Speiser v. Randall,*
    357 U.S. 513 (1958) ............................................................ 54

*Stern v. Marshall,*
    564 U.S. 462 (2011) ............................................................ 55

*Sunshine Anthracite Coal Co. v. Adkins,*
    310 U.S. 381 (1940) .................................................... 26, 27

*Todd & Co. v. SEC,*
    557 F.2d 1008 (3d Cir. 1977) ............................................................ 28

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ............................................................ 20

*United States v. Arthrex, Inc.*,
594 U.S. 1 (2021) ................................................................. 23, 34, 39

*United States v. Blount*,
906 F.3d 381 (5th Cir. 2018) ............................................. 13

*United States v. Cox*,
342 F.2d 167 (5th Cir. 1965) ............................................. 21

*United States v. Nixon*,
418 U.S. 683 (1974) ............................................................. 19, 30

*United States v. Texas*,
599 U.S. 670 (2023) ............................................................. 19

**Constitutional Provisions**

U.S. Const. amend. VII ....................................................... 45

U.S. Const. art. III.............................................................. 53

**Statutes**

5 U.S.C. § 706 .................................................................... 9

15 U.S.C. § 78c .................................................................. 22

15 U.S.C. § 78s................................................................... 1, 42

15 U.S.C. § 78y .................................................................. 1, 9

**Rules**

Fed. R. Civ. P. 38(b)........................................................... 48

**Other Authorities**

1 Annals of Cong. 499 (1789) (James Madison).................... 39

3 William Blackstone,
*Commentaries on the Laws of England* ............................... 58

*In re John Thomas Cap. Mgmt. Grp. LLC*,
Release No. 693, 2014 WL 5304908 (Oct. 17, 2014)............ 47

The Federalist No. 47,
(James Madison) (Jacob Cooke ed., 1961) .......................... 54

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner respectfully requests oral argument because it will assist the Court in its review of the issues presented by this petition.

# STATEMENT OF JURISDICTION

This Court has jurisdiction pursuant to § 25(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78y(a). Petitioner Eric S. Smith seeks review of a final order issued against him by Respondent U.S. Securities and Exchange Commission ("SEC") on August 19, 2024 (the "Order").[1] The Order, which disposed of all the issues between the parties, sustained findings of fact, conclusions of law, and sanctions imposed against Smith in September 2020 by Intervenor Financial Industry Regulatory Authority ("FINRA")—including permanent debarment from the securities industry and restitution in the amount of $130,000—based on events that occurred nearly a decade ago. SEC had statutory jurisdiction to review FINRA's sanctions pursuant to Exchange Act § 19(e), 15 U.S.C. § 78s(e).

FINRA's jurisdiction to impose disciplinary sanctions against Smith is a central issue of dispute in this review proceeding. As discussed herein, because Smith has never consented to FINRA's

---

[1] The petition is timely because Smith filed it on October 18, 2024, which is within 60 days of the Order's entry. 15 U.S.C. § 78y(a)(1). Venue is appropriate in the Sixth Circuit Court of Appeals because Smith is a resident of Michigan. *Id.*

jurisdiction or authority over him, FINRA lacked any lawful power to investigate him, prosecute him, or punish him.

Moreover, despite being threatened with permanent debarment from the securities industry, punitive fines, and an order to pay restitution based on allegations of securities fraud, Smith has, until now, been unconstitutionally deprived of any opportunity to defend himself before an independent Article III court—and he never received the jury trial guaranteed to him by the Seventh Amendment. *See SEC v. Jarkesy*, 603 U.S. 109 (2024) (enforcement cases threatening penalties based on allegations of securities fraud must be prosecuted in an Article III court with a jury trial). For this reason, neither FINRA nor SEC had constitutional jurisdiction to adjudicate FINRA's charges against Smith in non-jury proceedings conducted entirely outside of an Article III forum.[2]

---

[2] In March 2024, with his administrative appeal languishing before the SEC without a decision for more than three years, Smith sought a writ of mandamus from this Court that would have directed the SEC either to dismiss FINRA's disciplinary sanctions against him or to promptly decide his appeal. On August 5, 2024, the Court ordered the SEC to respond to Smith's Mandamus Petition within 30 days. The SEC then issued its Order in Smith's administrative appeal two weeks later on August 19, 2024, and the Court ultimately denied Smith's mandamus petition on November 8, 2024.

## STATEMENT OF ISSUES[3]

1.     Did FINRA, a private, non-governmental membership organization, have jurisdiction and lawful power to investigate, prosecute, and punish Smith absent Smith's consent, and did FINRA violate the private nondelegation doctrine by doing so?

2.     Did FINRA's investigation, prosecution, and punishment of Smith using personnel who were neither appointed nor removable by the President violate Article II of the Constitution?

3.     Did FINRA and SEC violate Article III of the Constitution and the Seventh Amendment by prosecuting and adjudicating FINRA's claims of securities fraud against Smith outside of an Article III court and without a jury?

---

[3] Smith anticipates that SEC and FINRA may fault him for not raising his constitutional arguments in the proceedings below, and if so, Smith will address that objection in his reply brief. For present purposes, Smith notes that both SEC and FINRA lack competence to adjudicate the kinds of constitutional arguments Smith asserts herein, *Axon Enter., Inc. v. FTC* and *SEC v. Cochran*, 598 U.S. 175, 194–96 (2023); *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 491 (2010); *Calcutt v. FDIC*, 37 F.4th 293, 312–13 (6th Cir. 2022), *rev'd on other grounds*, 598 U.S. 623 (2023), and that raising such arguments below would have been entirely futile given SEC's and FINRA's well-known and longstanding position—expressed in both adjudicative decisions and in court briefs—that FINRA disciplinary proceedings are categorically exempt from constitutional scrutiny.

## STATEMENT OF THE CASE

Petitioner Smith is a citizen and resident of Michigan.  He was the founder, chairman, chief executive, and majority owner of Consulting Services Support Corporation ("CSSC"), a company that provided research, marketing, technology, and administrative services to independent professionals (such as attorneys and accountants) who, in turn, provided investment advice to their clients.  JA003 (SEC Opinion 2).  Among other things, CSSC developed and patented a decision-assistance technology to score and rank thousands of available mutual funds, exchange-traded funds, and other potential investment vehicles based on weighted blends of multiple, client-specific investment criteria.  *Id.*

CSSC had several wholly owned subsidiaries, including a broker-dealer subsidiary (the "Brokerage Firm") that was a member of FINRA until June 2018.  JA0003 (SEC Op. 2).  Neither Smith nor CSSC has ever been a member of FINRA or registered with FINRA, and Smith has never served as an officer, director, or employee of the Brokerage Firm (nor any other FINRA member firm).  JA0068–69 (R. 2165–66).

Respondent SEC is an agency of the United States government headquartered in Washington, D.C. Intervenor FINRA is a private, nonprofit corporation incorporated under the laws of Delaware with its headquarters in Washington, D.C. FINRA operates as a members-only self-regulatory organization within the securities industry, subject to limited SEC oversight, with its lawful regulatory power extending only to firms and individuals—unlike Smith—who have consented to that jurisdiction by affirmatively registering with FINRA as either a member firm or obtaining a license from FINRA to work in specific roles at a member firm.

Smith's ordeal with FINRA dates back to 2015, when FINRA staff employees commenced a regulatory examination of the Brokerage Firm. JA0007 (SEC Op. 6). As noted above, the Brokerage Firm at the time was a FINRA member firm but its parent company, CSSC, was never a member of FINRA. While Smith was chief executive officer of the parent company, he was never an officer, director, or employee of the Brokerage Firm nor any other FINRA member firm, and he never registered with FINRA or otherwise consented to FINRA's exercise of regulatory or disciplinary jurisdiction over him.

In August 2017, at the conclusion of the examination and a subsequent investigation by FINRA's Department of Enforcement, FINRA staff employees commenced a formal disciplinary prosecution against Smith and the Brokerage Firm alleging misconduct in connection with certain securities transactions and events that occurred between 2010 and 2015.[4] Specifically, with respect to $130,000 raised through the sale of fixed-income securities in 2015, FINRA charged Smith and the Brokerage Firm with committing securities fraud and making material misrepresentations and omissions in violation of Exchange Act § 10(b) (15 U.S.C. § 78j(b)), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5), and FINRA Rules 2010 and 2020,[5] and with failing to register Smith with FINRA as an associated person and principal of the Brokerage Firm. JA0014 (SEC Op. 13). Over Smith's objection, FINRA claimed it could exercise regulatory and disciplinary jurisdiction over Smith, even though Smith had never registered with FINRA nor otherwise consented to such

---

[4] FINRA Complaint, *available at* https://www.finra.org/sites/default/files/fda_documents/2015043646501_FDA_JG412558%20%282019-1563250758943%29.pdf (last accessed Mar. 26, 2025).

[5] In the alternative, FINRA alleged so-called non-scienter fraud in violation of sections 17(a)(2) and 17(a)(3) of the Securities Act of 1933 and FINRA Rule 2010.

jurisdiction, and had never been an officer, director, nor employee of any FINRA member firm, based on FINRA's belief that Smith *should have been* registered with FINRA.

After an eight-day, non-jury hearing in June 2018, before a panel comprised of a FINRA-employed hearing officer and two FINRA-selected employees of unrelated FINRA member firms, the panel issued a decision in January 2019 ruling against Smith and the Brokerage Firm and in favor of FINRA in all material respects. JA0206 (R. 4219). As punishment, the hearing panel imposed a lifetime industry bar against Smith; suspended the Brokerage firm from participating in private securities offerings for one year (after the Brokerage Firm had already ceased all operations); imposed fines totaling $120,000 against the Brokerage Firm; and ordered Smith and the Brokerage firm, jointly and severally, to pay $130,000 in restitution to four investors plus approximately $12,000 as costs of the proceeding. JA0255–56 & n.344 (R. 4268–69 & n.344). No Article III judge or other governmental officer was involved in the prosecution or adjudication of FINRA's charges against Smith and the Brokerage Firm, and there was no option for a trial by jury.

In accordance with FINRA procedural rules, Smith filed a timely appeal with FINRA's National Adjudicatory Council (the "NAC"), which is FINRA's internal appellate tribunal. (The Brokerage Firm did not appeal.) The NAC issued FINRA's final decision in September 2020, affirming the hearing panel decision in all material respects and ordering Smith to pay another $1,283 in costs of the appeal. JA0299 (R. 4527). Again, no Article III judge or other government official was involved, and there was no option for a jury trial.

In October 2020, in accordance with SEC procedural rules, Smith filed an application for SEC appellate review of FINRA's decision, and he later requested oral argument. JA0301 (R. 4573). Briefing of that appeal was completed in March 2021, but SEC did not decide the appeal until more than three years later, when it issued a final order in August 2024 that upheld FINRA's decision in all material respects.[6] JA0001 (SEC Order). Once again, no Article III judge was involved, and there was no option for a jury trial.

---

[6] As noted elsewhere, SEC issued its decision just two weeks after this Court ordered the agency to respond to Smith's petition seeking a writ of mandamus that would have directed SEC to either set aside FINRA's sanctions or to at least issue a decision on Smith's appeal.

## STANDARD OF REVIEW

This Court sustains SEC's factual findings if supported by substantial evidence but will modify or set aside SEC's final order if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See Katz v. SEC*, 647 F.3d 1156, 1161 (D.C. Cir. 2011); *Graham v. SEC*, 222 F.3d 994, 999–1000 (D.C. Cir. 2000); 15 U.S.C. § 78y(a)(4); 5 U.S.C. § 706(2)(A).

## SUMMARY OF THE ARGUMENT

FINRA is a private company that had no lawful power to investigate, prosecute, or punish Smith because he is, in relation to FINRA, merely a member of the public who has never consented to FINRA's exercise of authority over him. Further, Congress cannot empower FINRA to bring such claims against a member of the general public without violating the private nondelegation doctrine.

If FINRA *does* have lawful power to pursue enforcement actions against the public, then its enforcement proceedings suffer from two different problems. Its adjudicators are not appointed in compliance with constitutional requirements, and they are not properly subject to the President's removal power. FINRA adjudicators exercise the same

powers as SEC administrative law judges, whose appointments must comply with the Appointments Clause. Because FINRA adjudicators and other officers were not commissioned as officers of the United States, they had no authority to prosecute or adjudicate an enforcement action against Smith. In addition, there are at least three levels of for-cause removal protection between the President and FINRA employees, which impairs his ability to exercise his non-delegable duty to "take Care that the Laws be faithfully executed" by removing them, if necessary. U.S. Const., art. III, § 3.

Finally, the proceedings below violated Smith's right to a jury trial in an Article III court. The Supreme Court decided just last term that the types of claims FINRA alleged and sanctions FINRA threatened against Smith entitled him to a jury trial pursuant to the Seventh Amendment. *SEC v. Jarkesy*, 603 U.S. 109 (2024). And even if he were not entitled to a jury, Article III's Vesting Clause still entitled him to have his case adjudicated in a court, not by a private corporation nor by an agency within the Executive Branch.

# ARGUMENT

## I.     FINRA HAS NO LAWFUL AUTHORITY OVER SMITH

FINRA is a private organization whose authority extends only to its members and registrants.  Smith is a member of the general public who has never been a FINRA registrant nor otherwise consented to FINRA's authority over him.  Consequently, FINRA had no authority to prosecute an enforcement action against Smith.  If FINRA contends that Congress has nonetheless granted it authority to pursue such an action, then to the extent that is true, Congress has violated the Constitution by delegating vast federal governmental power to a private party.

### A.     FINRA Is a Private Organization Exercising Government Power in This Enforcement Action

FINRA holds itself out as a private, self-regulatory organization— with emphasis on both "private" and "self."  But here, it claimed authority to apply its private rules to members of the public (like Smith), and the additional authority to adjudicate the public's compliance with not only FINRA's private rules, but also federal statutes.  But a private entity may not adjudicate the rights of a member of the public who has not consented to be subject to its authority.  So FINRA's exercise of authority in this enforcement action must be, if anything, governmental in nature,

not private.  This section of the brief will address FINRA's status as a private entity, describe the non-private aspects of the authority it claimed for itself, and identify those non-private aspects as, in reality, governmental power that private parties may not wield.

### 1.    FINRA Is a Private Organization

FINRA's website makes clear that it is a private organization with limited "self-regulatory" authority over its member firms and registered individuals who consent to its authority:  "FINRA is a *private* not-for-profit *membership* organization that is responsible under federal law for supervising our *member firms*";[7] "FINRA is a *self*-regulatory organization for *member broker-dealers* that is responsible under federal law for supervising our *member firms*;"[8]  *[W]e are not part of the government.*"[9] FINRA's restated certificate of incorporation similarly affirms that

---

[7] *About*, FINRA, *available at* https://www.finra.org/about (emphasis supplied) (last accessed Mar. 24, 2025).

[8] *Id*. (emphasis supplied).

[9] *Id*. (emphasis supplied).

FINRA is a private Delaware corporation whose regulatory activity is membership specific.[10]

FINRA and the United States have also represented to federal courts that FINRA is a private organization, not a part of the government. *See, e.g.*, *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1324 (D.C. Cir. 2024) ("[W]e assume without deciding that FINRA and the United States are correct that FINRA is not a governmental entity"); *Birkelbach v. SEC*, 751 F.3d 472, 479 (7th Cir. 2014) ("[T]he SEC opined that § 2462, which typically only applies to government agencies, does not apply to FINRA, which is a private self-regulatory organization, and, therefore, is not a government entity."); *United States v. Blount*, 906 F.3d 381, 385 (5th Cir. 2018) ("The Government concedes that FINRA is 'technically a private entity.'").

---

[10] "[T]he business or purposes to be conducted or promoted shall include the following: . . . To promote *self*-discipline *among members*, and to investigate and adjust grievances between the public and *members* and between *members*." Restated Certificate of Incorporation of Financial Industry Regulatory Authority, Inc., art. III, § 4 (available at https://www.finra.org/rules-guidance/rulebooks/corporate-organization/restated-certificate-incorporation-financial) (emphasis supplied). Nowhere does the Restated Certificate claim FINRA's purpose or authority extends to the investigation or adjudication of grievances that do not involve FINRA members or those who have voluntarily consented to its authority.

FINRA, however, has ambitions. This case signals that FINRA aspires to become something more than a mere private, self-regulatory organization. Not content just to regulate its own members and registrants (who consent to its authority), FINRA apparently wishes to regulate members of the general public, like Smith, who have not consented. Nor is FINRA content with enforcing its private rules against the members of the public; it also wants the power to enforce federal securities laws against them. So, in addition to being a private, self-regulatory organization, FINRA aspires to play the role Congress assigned to the SEC. How else can one explain this case?

Smith and FINRA disagree over whether he ought to have been a registrant, but they emphatically agree that he is not a registrant and never was. So FINRA's enforcement action cannot be understood as an attempt to enforce its private rules against members or registrants who have agreed to abide by them. Instead, FINRA is attempting to enforce its private rules against a member of the public, which makes no more sense than the PGA penalizing non-member golfers for failing to join or for violating its rules. Further, as a question of authority, FINRA enjoys

exactly the same standing as the PGA to enforce federal securities laws against members of the general public—which is to say, none.

### 2. FINRA Claims Non-Private Authority for Itself

And yet, exercising such authority against a member of the general public—by investigating, prosecuting, and adjudicating a case—is unquestionably what FINRA has done here. In its complaint against Smith, it alleged that, in distributing certain securities-offering documents in 2015, "Smith … willfully violated Section 10(b) of the Exchange Act and Rule 10b-5 … ."[11] It pursued that claim *at the same time* it was accusing Smith of being a member of the public, as opposed to a FINRA registrant.[12] FINRA's assertion that its private rules are generally applicable appeared in Counts II through V of its complaint against Smith, in each of which it alleged a member of the public violated one or more of its rules.

---

[11] FINRA Complaint at ¶89, *available at* https://www.finra.org/sites/default/files/fda_documents/2015043646501_FDA_JG412558%20%282019-1563250758943%29.pdf (last accessed Mar. 25, 2025).

[12] FINRA Complaint at ¶¶101–114, *available at* https://www.finra.org/sites/default/files/fda_documents/2015043646501_FDA_JG412558%20%282019-1563250758943%29.pdf (last accessed Mar. 25, 2025).

Each of the three decisions in this case confirms that FINRA aspires to act as a public authority, and to exercise public power, just like the SEC. FINRA's hearing panel decision reiterated FINRA's belief that it may enforce federal statutes against the public by concluding Smith was liable "[f]or knowingly or recklessly misrepresenting and omitting to disclose material facts in connection with the sales of securities, in willful violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder," JA0255 (R. 4268), while simultaneously concluding he was nothing more than a member of the public. The hearing panel also operationalized FINRA's belief that its private rules are not really private at all, but are enforceable against the public, when it concluded Smith violated NASD Rules 1021 and 1031, and FINRA Rule 2010, by not registering with FINRA. JA0256 (R. 4269).

Both the NAC and the SEC affirmed FINRA's hearing panel decision, agreeing (by implication if nothing else) that FINRA may enforce federal statutes as well as its private rules against the public. First, NAC ratified the panel's conclusion both that Smith is a member of the public, not a registrant, and that FINRA's private rules nonetheless apply to him, by affirming that "Smith acted as an

unregistered representative and principal, in violation of NASD Rules 1021 and 1031 and FINRA Rule 2010." JA0299 (R. 4527). The SEC agreed. JA0003 (SEC Op. at 2) (stating that Smith had violated "NASD Rules 1021 and 1031 and FINRA Rule 2010 …."). NAC also affirmed FINRA's understanding that it may enforce federal statutes against the public, stating: "We find that Smith fraudulently failed to disclose and misrepresented material facts to investors, in violation of Section 10(b) of the Exchange Act, Exchange Act Rule 10b-5 …." JA0299 (R. 4527). Again, the SEC agreed. JA0003 (SEC Op. at 2) (stating Smith violated "Section 10(b) of the Securities Exchange Act of 1934, [and] Rule 10b-5 thereunder ….").

In sum, the FINRA and SEC decisions stand for three troubling propositions. First, that FINRA's private rules are applicable to the public at large. Second, that FINRA has the authority to enforce federal statutes against the public. And third, that FINRA may commence, prosecute, and adjudicate enforcement actions against the public.

### 3. FINRA's Claimed Authority over Smith Is Governmental, Not Private

The power FINRA exercised against Smith in this case is governmental, not private—at least when deployed against the public.

Judge Justin Walker of the D.C. Circuit recently addressed this point in *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314 (D.C. Cir. 2024). His analysis considered the functions FINRA typically performs in its enforcement actions, which are premised on the authority to:

- Open an investigation;

- Demand to inspect books, records, or accounts;

- Require a brokerage employee to provide information orally, in writing, or electronically;

- Require an employee to testify under oath;

- Exercise prosecutorial discretion to choose formal disciplinary action instead of informal disciplinary action or to choose no action at all;

- Authorize complaints against member broker-dealers;

- Demand submission of trading data;

- Negotiate settlements;

- Require members to participate in live adjudicatory proceedings before an in-house tribunal;

- Release, at its discretion, information related to disciplinary proceedings;

- Impose the costs of the disciplinary proceeding on the disciplined member as FINRA  deems fair and appropriate";

- Issue large fines; and

- Expel a firm from FINRA and (in effect) from the securities industry, for violation of federal securities laws, federal

> regulations, or FINRA rules, or for failure to  promptly" pay
> a fine, sanction, or cost.

*Alpine*, 121 F.4th at 1343–45 (Walker, J., concurring in part) (footnotes omitted).

The power to prosecute alleged violations of federal law is amongst "the greatest unilateral powers a President possesses …." *In re Aiken Cnty.*, 725 F.3d 255, 264 (D.C. Cir. 2013). "Unilateral," that is, in the sense that the power belongs to him alone and is a type of power that by its nature cannot be exercised by private parties like FINRA. "[C]onsider FINRA's power to initiate an enforcement action …," Judge Walker invited. *Alpine*, 121 F.4th at 1345 (Walker, J., concurring in part). "The problem? That's the power to decide whether to take enforcement actions against violators of federal law," *id.* (cleaned up), which is "one discrete aspect of the executive power." *United States v. Texas*, 599 U.S. 670, 684 (2023). This power is governmental by its very nature because "the Executive Branch has *exclusive* authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon*, 418 U.S. 683, 693 (1974) (emphasis supplied) (citing *Confiscation Cases*, 7 Wall. 454 (1869)); *see also Cmty. for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986) ("The power to decide when to investigate,

and when to prosecute, lies at the core of the Executive's duty to see to the faithful execution of the laws ….");  *In re Aiken Cnty.*, 725 F.3d at 266 (executive authority encompasses decision on whether to pursue "punishment, penalties, or sanctions.").

The Executive Branch's exclusive authority also encompasses the decision whether to settle or terminate an enforcement action.  This is another governmental power that cannot be given to private parties: "[T]he choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch, not within the purview of private plaintiffs" like FINRA.  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021).  "Also consider FINRA's power to settle an enforcement action," suggests Judge Walker.  *Alpine*, 121 F.4th at 1345 (Walker, J., concurring in part).  "That settlement would constitute final disciplinary action of FINRA.  But look at what's missing.  At no time was the SEC involved.  Nor was any executive officer with a commission from the President—just a Delaware corporation enforcing federal law."  *Id*. at 1346.[13]  The decision to settle

---

[13] The SEC, as a government agency, has all the authority it needs to prosecute members of the public for violations of federal securities law.

or terminate a prosecution is necessarily governmental for the additional reason that such a decision "may well depend upon matters of policy wholly apart from any question" of the case's merits. *United States v. Cox*, 342 F.2d 167, 171 (5th Cir. 1965). Implementation of the nation's policy interests, of course, cannot be directed by private parties in place of duly elected or appointed officials.

"Put simply," for members of the public like Smith, "FINRA operates as the 'principal decisionmaker in the use of federal power.'" *Alpine*, 121 F.4th at 1344 (quoting *Oklahoma v. United States*, 62 F.4th 221, 229 (6th Cir. 2023), *cert. denied*, 144 S. Ct. 2679 (2024)). That's a problem, because private entities are not supposed to exercise the government's power: "Congress may employ private entities for ministerial or advisory roles, but it may not give these entities governmental power over others." *Pittston Co. v. United States*, 368 F.3d 385, 395 (4th Cir. 2004). That, however, is exactly what FINRA thinks Congress gave it, which brings us to the private nondelegation doctrine.

---

So FINRA's attempt to claim similar authority is not only incompatible with the Constitution but unnecessary.

## B. FINRA's Enforcement Action Against Smith Violated the Private Nondelegation Doctrine

SEC appears to believe that Congress intentionally assigned to a private organization the executive and judicial authority necessary to conduct enforcement actions against the public. Specifically, it said "the Exchange Act itself requires that self-regulatory organizations (like FINRA) enforce the federal securities laws and their own rules, including by disciplining the associated persons of its members, and neither the Exchange Act nor FINRA bylaws definitions of an associated person hinges on that person's registration status." JA0011 (SEC Op. at 10). It is true that the statutory definition of "an associated person" does not include a specific warning that it comprises only those "associated persons" who have registered with FINRA.[14] But that definition inherently limits itself to FINRA registrants. Absent such a limitation, one would have to suppose that Congress intentionally deposited federal

_____

[14] 15 U.S.C. § 78c(a)(21) ("The term 'person associated with a member' or 'associated person of a member' when used with respect to a member of a national securities exchange or registered securities association means any partner, officer, director, or branch manager of such member (or any person occupying a similar status or performing similar functions), any person directly or indirectly controlling, controlled by, or under common control with such member, or any employee of such member.").

governmental power in private hands.  If that were its intent, one would expect such an unorthodox assignment to be heralded by something more specific than a loose definition.  But whether Congress intentionally (or accidentally) granted such power to FINRA, or FINRA just took it for itself, the result is the same—a violation of the constitutional principle that only the government may wield such authority over the public.

Article II of the Constitution provides that "[t]he executive Power shall be vested in a President of the United States."[15]  And then it circumscribes and binds that immense power to the President by imposing on him the duty to "take Care that the Laws be faithfully executed."[16]  A duty, by the way, that he cannot delegate:  "The President is responsible for the actions of the Executive Branch and cannot delegate [that] ultimate responsibility or the active obligation to supervise that goes with it." *United States v. Arthrex, Inc.*, 594 U.S. 1, 11 (2021) (cleaned up).  Thus, the Constitution entrusts the President, not private parties, with the power and duty to enforce federal law.  *Nixon v. Fitzgerald*, 457 U.S. 731, 749–50 (1982).  The principle that Congress cannot move this

---

[15] U.S. Const. art. II, § 1.

[16] U.S. Const. art. II, § 3.

authority outside the government and into the hands of private entities, like FINRA, has come to be known as the "private nondelegation doctrine."

The doctrine had its genesis when the Court considered whether Congress may delegate rulemaking power to private entities. It cannot: "Even the United States accepts that Congress cannot delegate regulatory authority to a private entity." *Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 61 (2015) (Alito, J., concurring) (cleaned up). Such a practice, if allowed, would represent "legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business." *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936).

Such delegations exceed Congress's power so completely that "[w]hen it comes to private entities" wielding regulatory power, Justice Alito says "there is not even a fig leaf of constitutional justification." *Ass'n of Am. Railroads*, 575 U.S. at 62 (Alito, J., concurring). So regulatory power must be kept out of private hands because "[i]f it were otherwise—if people outside government could wield the government's

power—then the government's promised accountability to the people would be an illusion." *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 880 (5th Cir. 2022) (citing The Federalist No. 51 (James Madison) ("A dependence on the people is, no doubt, the primary control on the government[.]")).

The delegation problem is compounded in cases like this, in which the "delegated" authority is executive and judicial, as opposed to legislative. There are two reasons this is so. First, in the rulemaking context, at least Congress purports to delegate its *own* authority; here (according to FINRA and the SEC), Congress delegated *executive* and *judicial* authority to private hands—a practical impossibility inasmuch as Congress has not been entrusted with those powers to begin with. "The structure of the Constitution does not permit Congress to execute the laws; it follows that Congress cannot grant to an officer under its control what it does not possess." *Bowsher v. Synar*, 478 U.S. 714, 726 (1986). Neither does Congress have the power to exercise the judicial power of the United States. It follows by necessary implication that if the delegation cannot be made to an officer under congressional control, it certainly cannot be made to someone *not* under its control (like a

private party). So, because Congress cannot delegate what it does not have, it could not even theoretically "delegate" the executive and judicial power FINRA needs to prosecute and adjudicate enforcement actions against the public.

Second, the extent of the private party's involvement must be so cabined through close oversight and review that it can best be described as merely advisory, not authoritative. Private parties, for example, can "operate as an aid" to a government commission, but only so long as they are "subject to its pervasive surveillance and authority." *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388 (1940). And while they "may serve as *advisors* that *propose* regulations," they cannot have the authority to adopt rules on their own authority. *Oklahoma v. United States*, 62 F.4th 221, 229 (6th Cir. 2023), *cert. denied*, 144 S. Ct. 2679 (2024) (emphasis supplied); *see also Black*, 53 F.4th at 872 ("A cardinal constitutional principle is that federal power can be wielded only by the federal government. Private entities may do so only if they are subordinate to an agency.").

FINRA's exercise of authority here cannot square with the nondelegation standards enunciated by either this court or the Supreme

Court. Its exercise of executive power was not "subject to [any government actor's] pervasive surveillance and authority." *Sunshine Anthracite Coal Co.*, 310 U.S. at 388. Nor was it serving as a mere "advisor." *Oklahoma*, 62 F.4th at 229. And its exercise of executive authority was not "subordinate to an agency." *Black*, 53 F.4th at 872. Indeed, in its exercise of executive authority, it was not subordinate to *anyone*: "This panoply of enforcement powers requires no contemporaneous oversight by the SEC. The SEC does not control FINRA's investigations [or] its prosecutions ...." *Alpine*, 121 F.4th at 1340. Nor does SEC's after-the-fact review of FINRA's decision remedy this lack of oversight. By the time the matter reaches SEC for review, FINRA's exercise of executive authority is complete and cannot be undone, even if (in those rare FINRA enforcement cases that ever receive any SEC review at all[17]) the reputationally and economically destructive sanctions can be modified or set aside. So, not only does FINRA exercise substantial executive authority without SEC oversight, its exercise of that authority is and was entirely *unreviewable*. Consequently, "[t]his

---

[17] The vast majority of FINRA enforcement proceedings end in settlements or defaults, and thus are never appealed even to SEC, much less to a federal appeals court.

'especially provocative exercise of governmental power by a private organization' transgresses the private nondelegation doctrine." *Id.* at 1345 (quoting 1 Kenneth Culp Davis, A*dministrative Law Treatise* 141 (1st ed. 1958)).

While other courts have concluded that FINRA's enforcement actions cause no private nondelegation violation, they only addressed enforcement against FINRA *members* and *registrants*.[18] *See, e.g.*, *R. H. Johnson & Co. v. SEC*, 198 F.2d 690 (2d Cir. 1952) (enforcement against R.H. Johnson, an NASD member); *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690 (3d Cir. 1979) (enforcement action against First Jersey, an NASD member); *Todd & Co. v. SEC*, 557 F.2d 1008 (3d Cir. 1977) (enforcement action against Todd & Co., an NASD member); *Sorrell v. SEC*, 679 F.2d 1323 (9th Cir. 1982) (enforcement action against Sorrell; no indication he was not an NASD registrant). Those members and registrants, unlike Smith, voluntarily joined the organization, knowing they were subjecting themselves to its private rules allowing for such

---

[18] FINRA's authority to pursue an enforcement action against members or registrants for a violation of federal law is not implicated by this case, and so we do not address that issue.

proceedings. But that justification has no place here because Smith was never a FINRA registrant.

Although this Court has not had the opportunity to thoroughly address FINRA's enforcement authority, it did mention it in passing while analyzing the provisions of the Horseracing Safety and Integrity Act in *Oklahoma v. United States*, 62 F.4th 221. It noted that "the SEC applies fresh review to the SRO's decisions and action," and observed that "courts have upheld this arrangement [against delegation challenges], reasoning that the SEC's ultimate control over the rules and their enforcement makes the SROs permissible aides and advisors." *Id.* at 229. With respect, this was not an in-depth analysis, and there are three reasons the cases the court cited cannot support FINRA's claim of authority.

First, *R. H. Johnson & Co.*, *First Jersey Sec., Inc.*, *Todd & Co.*, and *Sorrell* addressed only the adjudicative aspect of NASD's enforcement proceedings, holding that the SEC's review of the underlying findings of fact and conclusions of law dispelled any delegation concerns. At least in some instances, the NASD adjudicated cases that not only did not belong in its private tribunals, their adjudication did not belong in the Executive

Branch at all. *SEC v. Jarkesy*, 603 U.S. 109 (2024). It certainly vitiates the value of these cases to the extent their succor comes from the SEC conducting a review function that was not its to perform.

Second, and more importantly, the cited cases simply did not consider at all whether NASD's exercise of *executive* authority in its enforcement actions violated the private nondelegation doctrine. Judge Walker's *Alpine* opinion provides a handy template for measuring the amount of executive power FINRA exercised in this case. Applying it here, the exercises of executive power nearly jump off the page: FINRA opened an investigation into whether a member of the public violated federal law; it exercised prosecutorial discretion in deciding to pursue a formal enforcement action; it authorized a complaint against a member of the public; and it prosecuted the enforcement action to conclusion and beyond. As described above, these powers are amongst "the greatest unilateral powers a President possesses," *In re Aiken Cnty.*, 725 F.3d at 264, and they are exclusive to the Executive Branch, *Nixon*, 418 U.S. at 693.

Third—and this clinches the matter—the type of power exercised by FINRA in this case is not only exclusively governmental, the Supreme

Court has said that its exercise is restricted to "officers of the United States" who obtain their positions in compliance with the Appointments Clause. *See, e.g.*, *Lucia v. SEC*, 585 U.S. 237 (2018) (SEC Administrative Law Judges); *Freytag v. Comm'r*, 501 U.S. 868 (1991) (Special Trial Judges). It would be truly bizarre if the Appointments Clause requires that, within the government, only properly appointed officers may use the power exercised by FINRA in this case, but that the government may evade the Appointments Clause altogether through the simple expedient of assigning this power to private citizens. And it should be noted that *R. H. Johnson & Co.*, *First Jersey Sec., Inc.*, *Todd & Co.*, and *Sorrell* were all decided before *Lucia* and *Freytag* (not to mention *Jarkesy*), and none of those courts considered the Appointments Clause implications of private companies prosecuting and enforcing alleged violations of federal statutes against the public.

For those three reasons, the cited cases provide no support for FINRA's exercise of federal executive authority. The most straightforward resolution of this case is to conclude either that FINRA lacks the authority to prosecute enforcement actions against the public or that the claim of such authority violates the private nondelegation

doctrine. If the case is not resolved on one of those bases, however, FINRA's position just "runs headlong into the rest of the Constitution." *Alpine*, 121 F.4th at 1346 (Walker, J., concurring in part). And the first provisions it encounters are the Appointments and "Take Care" Clauses.

## II. THE FINRA AND NAC HEARING OFFICERS WERE UNCONSTITUTIONALLY APPOINTED AND RETAINED

By asserting FINRA's authority to prosecute an enforcement action against Smith, the SEC painted itself into a corner because now it must convince the court that FINRA's hearing officers are appropriate adjudicators. And it cannot do that without contradicting both the Constitution and the Supreme Court. Neither the FINRA hearing panelists nor the NAC reviewers were appointed pursuant to the Appointments Clause,[19] nor are they appropriately subject to removal by the President pursuant to his non-delegable duty to "[t]ake care that the laws be faithfully executed."[20] Consequently, they lacked authority to hear and adjudicate the case against Smith. And that means they had no authority to issue findings of fact or conclusions of law, from which

---

[19] U.S. Const. art. II, § 2.

[20] U.S. Const. art. II, § 3.

32

follows the necessary conclusion that SEC had no valid decision to review.

The authority to prosecute or adjudicate violations of federal law is exclusively governmental, as explained above. For purposes of our Appointments Clause argument here, we assume the claims at issue could have been properly addressed through the exercise of executive power within the Executive Branch. However, in our discussion of the third issue below (*i.e.*, *Jarkesy*), that premise will be shown to be untenable.

## A. None of the Hearing Officers Was Properly Appointed

There exists within FINRA an Office of Hearing Officers (the "OHO"), which FINRA describes as "an independent office … that employs professional Hearing Officers who preside over disciplinary and expedited actions commenced by FINRA's Enforcement Department."[21] When FINRA wishes to pursue an enforcement action, one of its offices (the Department of Enforcement) files a complaint with another of its

---

[21] *Office of Hearing Officers*, FINRA, *available at* https://www.finra.org/rules-guidance/adjudication-decisions/office-hearing-officers-oho/about (last accessed Mar. 24, 2025).

offices (the OHO).[22]  The OHO then selects one of its employees to serve as a hearing officer, and the Chief Hearing Officer appoints individuals from two FINRA member firms to fill out the panel.[23]  Appeals from panel decisions are heard by the NAC, FINRA's in-house appellate panel, which it describes as "a FINRA committee"[24] whose members are apparently drawn from the community.[25]  But these adjudicators cannot exercise the authority they did in this case for the very same reasons the *Lucia* Court said SEC administrative law judges who had not received an Appointments Clause-compliant commission could not do so.

In our form of government, the executive power—all of it—"is vested in the President, who has the responsibility to 'take Care that the Laws be faithfully executed.'"  *Arthrex*, 594 U.S. at 6 (quoting U.S. Const.

---

[22] *Id*. ("When the Department of Enforcement chooses to initiate a formal disciplinary action, it files a complaint with OHO ….").

[23]  *Id*. ("The panel is chaired by a Hearing Officer, an independent adjudicator who is an employee of OHO. The Chief Hearing Officer appoints two industry panelists ….").

[24]*National Adjudicatory Council*, FINRA, *available at* https://www.finra.org/rules-guidance/adjudication-decisions/national-adjudicatory-council-nac (last accessed Mar. 24, 2025).

[25]*NAC Committee Members*, FINRA, *available at* https://www.finra.org/rules-guidance/adjudication-decisions/national-adjudicatory-council-nac/members  (last accessed Mar. 24, 2025) (listing of NAC members).

art. II, § 1, cl. 1; § 3); *Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020)

("The entire 'executive Power' belongs to the President alone.").

However, the Framers understood that "no single person could fulfill that

responsibility alone …." *Seila Law*, 591 U.S. at 204. Indeed, they

"expected that the President would rely on subordinate officers for

assistance." *Id*. To that end, Article II § 2 of the Constitution specifies

the method of appointing such persons:

> [H]e shall nominate, and by and with the Advice and Consent
> of the Senate, shall appoint … all other Officers of the United
> States, whose Appointments are not herein otherwise
> provided for, and which shall be established by Law: but the
> Congress may by Law vest the Appointment of such inferior
> Officers, as they think proper, in the President alone, in the
> Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2.

But not everyone who works for the federal government is an

"officer"—most are line employees about whose positions the

Appointments Clause says nothing. The first task in applying this

constitutional provision, therefore, is distinguishing between positions

that may be staffed with "employees" as opposed to those that must be

filled with "officers." The Supreme Court describes the distinction

between the two in a manner that unmistakably requires that officers of

the United States, not employees—and certainly not employees of a

private company—must execute the tasks performed by FINRA in this case. "The inquiry," the Court said, "focuse[s] on the extent of power an individual wields in carrying out his assigned functions." *Lucia*, 585 U.S. at 245. This inquiry comprises two aspects: the existence of a "continuing position," and the "exercis[e] [of] significant authority pursuant to the laws of the United States." *Id.* (internal quotation marks omitted).

*Lucia* is dispositive. The Court concluded that SEC's administrative law judges are subject to the Appointments Clause because they "hold a continuing office established by law," *id.* at 247, and they "exercise the same 'significant discretion' when carrying out the same 'important functions'" as officials the Court had previously determined must be classified as officers of the United States. *Id.* at 248 (citing *Freytag*, 501 U.S. at 878).

The Court concluded that, because ALJs "have all the authority needed to ensure fair and orderly adversarial hearings—indeed, nearly all the tools of federal trial judges," they exercise "significant discretion" with respect to "important functions" such that they must be classed as officers. *Id.* That conclusion was based on four observations about the

ALJs' power: (1) they "take testimony" by "receiv[ing] evidence and examin[ing] witnesses at hearings, and … tak[ing] pre-hearing depositions"; (2) they "conduct trials," during which they "administer oaths, rule on motions, and generally regulate the course of a hearing, as well as the conduct of parties and counsel"; (3) they "rule on the admissibility of evidence," which means "[t]hey thus critically shape the administrative record (as they also do when issuing document subpoenas)"; and (4) they "have the power to enforce compliance with discovery orders" by "punish[ing] all contemptuous conduct, including violations of those orders, by means as severe as excluding the offender from the hearing." *Id.* (cleaned up). Finally, an ALJ's work product resembles that of a trial judge inasmuch as they "issue decisions containing factual findings, legal conclusions, and appropriate remedies." *Id.* at 249. And that makes ALJs officers of the United States: "For all the reasons we have given, and all those *Freytag* gave before, the [SEC's] ALJs are 'Officers of the United States,' subject to the Appointments Clause." *Id.* at 251.

The authority exercised by FINRA's adjudicators in this case is indistinguishable from the power of the SEC's ALJs.[26] "As in *Lucia* and *Freytag*, FINRA's hearing officers are permanent employees in continuing offices exercising 'important functions' identified by the Supreme Court as markers of 'significant authority.'" *Alpine*, 121 F.4th at 1347 (Walker, J., concurring). They "have authority to do all things necessary and appropriate to discharge their duties, which (as in *Lucia* and *Freytag*) includes taking testimony, conducting trials, ruling on the admissibility of evidence, and enforcing compliance with discovery orders." *Id*. (citing FINRA Rules 9235(a), 9280, and 9260 *et seq*.). And, Judge Walker concluded, "in performing these tasks, hearing officers exercise a wide degree of discretion—a hallmark of 'significant authority.'" *Id*. The NAC adjudicators likewise exercised powers akin to those exercised by the SEC commissioners when reviewing the case on

---

[26] FINRA's employees do not occupy positions created by law, which distinguishes them from the SEC's ALJs. But this distinction is not an excuse, it's a further indictment because it not only moves them further away from the chain of accountability, but it also adds an additional dimension of distance by ensuring they are not even government employees. The Appointments Clause problem is solved by tying those who exercise this power more closely to the President, not by pushing the power out of the government altogether.

administrative appeal, and indeed to those exercised by this Court in this review proceeding.  Because all of this is true, no one but an officer commissioned pursuant to the Appointments Clause could exercise the type of authority the FINRA adjudicators brought to bear in this case.

But as it is, until this case reached the SEC, no one who touched it was appointed by the President, a court of law, or a department head. Nor were any of them even employed by the federal government.  They were, instead, private employees or appointees of a private company.  The conclusion that this violates the Appointments Clause is inescapable.

The point of the Appointments Clause is to maintain "a clear and effective chain of command down from the President, on whom all the people vote," *Arthrex*, 594 U.S. at 11 (internal quotation marks omitted), so that "the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community," 1 Annals of Cong. 499 (1789) (James Madison).  For it is only with that dependence that the officers' exercise of executive power "acquires its legitimacy and accountability to the public …." *Arthrex*, 594 U.S. at 11.

Not only is there not "a clear and effective chain of command" between the President and FINRA's adjudicators and others employees, no chain exists at all. FINRA's adjudicators and employees who handled this case did so without any accountability to anyone anywhere in the government. If the SEC's ALJs cannot wield this executive power without commissions lawfully obtained via the Appointments Clause, then neither can FINRA's employees. Congress cannot escape the Appointments Clause's strictures by outsourcing executive power to private companies. So, FINRA exercised power that was neither legitimate nor accountable to the public.

## B. None of the FINRA Adjudicators Is Properly Accountable to the President

FINRA's adjudication of Smith's case not only violated the Appointments Clause, it also violated the constitutional requirement that those who exercise such power be properly accountable to the President. FINRA employees are appointed by a private company, as opposed to anyone identified in the Appointments Clause, so it almost necessarily follows that they won't be properly subject to the President's power to remove them from their positions. And, in fact, that is the case.

Wherever the outermost edges of the President's removal authority might be, the Supreme Court is perfectly clear that "multilevel protection from removal is contrary to Article II's vesting of the executive power in the President." *Free Enter. Fund*, 561 U.S. at 484. Without the power to dismiss subordinates, "[t]he President cannot 'take Care that the Laws be faithfully executed'" because that power is, at least as a final resort, the *ne plus ultra* in "oversee[ing] the faithfulness of the officers who execute them." *Id.* (quoting U.S. Const. art. II, § 3).

That oversight power dissipates as the levels of protection pile up because "[t]he President cannot remove an officer who enjoys more than one level of good-cause protection, even if the President determines that the officer is neglecting his duties or discharging them improperly." *Id.* The fate of such an officer is not the President's to determine because it "is instead committed to another officer, who may or may not agree with the President's determination, and whom the President cannot remove simply because that officer disagrees with him." *Id.* So, the Court concluded that "dual for-cause limitations on the removal of [government officers] contravene the Constitution's separation of powers," *id.* at 492,

and displaces "the President's constitutional obligation to ensure the faithful execution of the laws." *Id*. at 484 (cleaned up).

*Free Enterprise Fund* is dispositive on this issue. FINRA itself acknowledges that, within the company, its hearing officers enjoy multiple levels of protection from removal. The OHO, FINRA says, "reports directly to FINRA's Chief Executive Officer. Furthermore, employment protections exist for Hearing Officers to further ensure their independence. Only FINRA's Chief Executive Officer can terminate a Hearing Officer, and the termination can be appealed to the Audit Committee of FINRA's Board of Governors."[27]

That is before the decisionmaking even reaches the first government official with any authority to address FINRA's staffing. Once the decision does come within the government's ambit, there are even more layers of removal protection. FINRA's CEO may be removed by the SEC Commissioners, but only for good cause. 15 U.S.C. § 78s(h)(4)(b). And it may well be that SEC Commissioners cannot be removed without cause either. *Free Enter. Fund*, 561 U.S. at 487 ("The

---

[27]*Office of Hearing Officers*, FINRA, *available at* https://www.finra.org/rules-guidance/adjudication-decisions/office-hearing-officers-oho/about

parties agree that the Commissioners cannot themselves be removed by the President except under the *Humphrey's Executor* standard of 'inefficiency, neglect of duty, or malfeasance in office ....'" *See also Jarkesy v. SEC*, 34 F.4th 446, 464 (5th Cir. 2022) ("SEC Commissioners may only be removed by the President for good cause.").

Altogether, that's at least three, and likely four levels of for-cause removal protection. The *Free Enterprise Fund* Court said *two* levels are unconstitutional.

\* \* \*

This argument frankly depends on the idea that the Constitution is not vulnerable to sophisticated efforts to evade its commands. *Cf.*, *Harman v. Forssenius*, 380 U.S. 528, 540–41 (1965) (Constitution "nullifies sophisticated as well as simple-minded modes of impairing the rights it guarantees." (cleaned up)). If a government employee cannot exercise the powers that FINRA employed in this case without a commission that complies with the Appointments Clause, it must also mean that Congress cannot shirk that command by assigning the exact same duties to private individuals. And if there can be only one layer of removal protection between the President and officers of the United

States, it would make no sense to conclude that Congress could build in as many layers of protection as it might wish simply by entirely removing those duties and powers from the governmental realm.

## III.    THIS ENFORCEMENT ACTION VIOLATES BOTH THE SEVENTH AMENDMENT AND THE ARTICLE III VESTING CLAUSE

The Constitution promises Smith something he never received: a jury trial in an Article III court.  What he received instead was mostly a private company's inter-office discussion about whether he violated federal securities laws and what his punishment ought to be.

Smith's right to a jury was definitively recognized by *SEC v. Jarkesy*, in which the Supreme Court declared that securities fraud claims must be tried by a jury, especially where, as here, the prosecutors demand monetary fines and other monetary sanctions.  Even if FINRA's securities fraud claims and monetary sanction demands did not implicate the Seventh Amendment, *Jarkesy*'s second holding would still have entitled Smith to a bench trial in an Article III court.

### A.    Smith Was Entitled to a Jury

The Seventh Amendment commands that "[i]n suits at common law, where the value in controversy shall exceed twenty dollars, the right

of trial by jury shall be preserved …."[28]  The *Jarkesy* Court (and the cases it cited) recounted the foundational importance of the right to a jury and how the centrality of that right arrived in the 21st century undiminished. Because *Jarkesy* addressed the very same federal statutes and claims at issue in this case, it also did all the heavy lifting in establishing that Smith did not receive the jury trial vouchsafed to him by our Constitution.  All that remains is to match the details of this case to the *Jarkesy* analysis.

The Seventh Amendment applies only to suits at "common law," of course, so the *Jarkesy* Court started its analysis by noting that the Seventh Amendment uses this term "in contradistinction to equity, and admiralty, and maritime jurisprudence." *Jarkesy*, 603 U.S. at 122 (cleaned up).  The Amendment's scope, therefore, is capacious enough to "embrace[] all suits which are not of equity or admiralty jurisdiction, whatever may be the peculiar form which they may assume." *Id*.  That includes statutory claims, so long as they are "legal in nature." *Id*.  To determine whether a claim is "legal in nature," a court must "consider the cause of action and the remedy it provides." *Id*. at 123.  But "some

---

[28] U.S. Const. amend. VII.

causes of action sound in both law and equity," so to distinguish between them the Court said the analysis must focus on the remedy as "the more important consideration." *Id*. (cleaned up). Because a legal remedy is available only when the cause of action sounds in law (as opposed to equity or admiralty), this is a reliable indicium of a "suit at common law" in which a jury must be available. *Id*. The final consideration involves the potential applicability of the "public rights" doctrine.

Our entry point in the analysis is toward the end, inasmuch as *Jarkesy* already decided that the principal charge FINRA brought against Smith—securities fraud—is "legal in nature," especially when the charging agency seeks civil penalties or similar monetary sanctions. Both Smith and Jarkesy were charged with securities fraud in violation of Section 17(a) of the Securities Act, as well as Section 10(b) of the Exchange Act and SEC Rule 10b-5,[29] which exposed each of them to civil fines.

---

[29] *Compare* FINRA Complaint at ¶3, *available at* https://www.finra.org/sites/default/files/fda_documents/2015043646501_FDA_JG412558%20%282019-1563250758943%29.pdf (last accessed Mar. 25, 2025) ("Smith repeatedly violated Section 10(b) of the Securities Exchange Act of 1934 … and Rule 10b-5 thereunder, [and] Section 17 (a)(2)-(3) of the Securities Act of 1933 ….") *with In re John Thomas Cap.*

The *Jarkesy* Court found it significant that civil fines under the Securities Exchange Act are potentially available when, *inter alia*, "the alleged misconduct involved fraud, deceit, manipulation, or deliberate or reckless disregard for regulatory requirements," the misconduct "caused harm," or the circumstances indicated "the need for deterrence …." *Id.* at 123–24 (citing 15 U.S.C. §§ 78u–2(c), 80b–3(i)(3)). Such fines, the Court said, are "legal rather than equitable" when they are tied "to the perceived need to punish the defendant rather than to restore the victim …." *Id.* at 124. A civil sanction that "cannot fairly be said *solely* to serve a remedial purpose, but rather can only be explained as *also* serving either retributive or deterrent purposes, is punishment." *Id.* at 123 (emphasis supplied). "In sum," the Court said, "the civil penalties in this case are designed to punish and deter, not to compensate. They are therefore a type of remedy at common law that could only be enforced in courts of law." *Id.* at 125 (cleaned up).

---

*Mgmt. Grp. LLC*, Release No. 693, 2014 WL 5304908, at *21 (Oct. 17, 2014) ("The OIP charges that JTCM and Jarkesy willfully violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.").

FINRA's case against Smith exposed him to the same type of civil fines as the SEC's prosecution against Jarkesy.[30] The *ad damnum* clause of FINRA's complaint sought an "order that one or more of the sanctions provided under FINRA Rule 8310(a) be imposed, including [that] the Respondents be required to disgorge fully any and all ill-gotten gains and/or make full and complete restitution, together with interest ...."[31] As relevant here, that rule empowers FINRA to "impose a fine ...."[32]

FINRA's fines are identifiable as punishment based on the same factors listed in *Jarkesy*—they are imposed for culpable behavior, they do not serve a remedial purpose, and they are designed to deter. The complaint in this case made it clear that Smith was at risk of fines for

---

[30] The right to a jury must be assessed according to the nature of the claims made and potential sanctions because jury demands must be made in response to the pleadings. *See* Fed. R. Civ. P. 38(b) ("On any issue triable of right by a jury, a party may demand a jury trial by: (1) serving the other parties with a written demand—which may be included in a pleading—no later than 14 days after the last pleading directed to the issue is served ....").

[31] FINRA Complaint at p.22, *available at* https://www.finra.org/sites/default/files/fda_documents/2015043646501_FDA_JG412558%20%282019-1563250758943%29.pdf (last accessed Mar. 25, 2025).

[32] FINRA Rule 8310(a), *available at* https://www.finra.org/rules-guidance/rulebooks/finra-rules/8310 (last accessed Mar. 25, 2025).

culpable behavior. FINRA made the same type of "fraudulent misrepresentation" accusations against Smith that the SEC made against Jarkesy. The *Jarkesy* Court concluded the SEC's sanctions were tied to that culpable behavior, *id.* at 124, while the same relationship between fines and alleged culpable behavior is evident here. FINRA's 2015 Sanction Guideline (which correlates to the period of time covered by the complaint) recommends a "[f]ine of $10,000 to $146,000" for what it describes as "Intentional or Reckless Use of Misleading Communications."[33]

FINRA's fines are also identifiable as punishment in that they have no remediating aspect whatsoever. Fines are paid to FINRA, not the person who was allegedly defrauded: "All fines and other monetary sanctions shall be paid to the Treasurer of FINRA and shall be used for the general corporate purposes."[34] This aligns with *Jarkesy*'s observation that "[t]he final proof that this remedy is punitive is that the SEC is not

---

[33] FINRA, *Sanction Guidelines* (2015) at 80, *available at* https://www.finra.org/sites/default/files/2015_Sanction_Guidelines.pdf (last accessed Mar. 25, 2025).

[34] FINRA, Rule 8320(a), *available at* https://www.finra.org/rules-guidance/rulebooks/finra-rules/8320 (last accessed Mar. 25, 2025).

obligated to return any money to victims."  603 U.S. at 124.  Nor are the fines even used to defray the cost of proceedings, which are separately assessed under FINRA Rule 8330.[35]  Finally, the intent behind the sanctions is to serve as deterrence: "Adjudicators should design sanctions that are meaningful and significant enough to prevent and discourage future misconduct by a respondent and deter others from engaging in similar misconduct."[36]

The final step of the Seventh Amendment analysis is considering the potential impact of the "public rights" doctrine which, the Court says, allows Congress—in some instances—to "assign the matter for decision to an agency without a jury …." *Jarkesy*, 603 US. at 127.  The short answer is that the doctrine has no application here.  The *Jarkesy* Court said the purpose of the action under consideration was "to regulate transactions between private individuals interacting in a pre-existing

---

[35] "A member or person associated with a member disciplined pursuant to Rule 8310 shall bear such costs of the proceeding as the Adjudicator deems fair and appropriate under the circumstances."  FINRA, Rule 8330, *available at* https://www.finra.org/rules-guidance/rulebooks/finra-rules/8330 (last accessed Mar. 25, 2025).

[36] FINRA, *Sanction Guidelines* (2015) at 2, *available at* https://www.finra.org/sites/default/files/2015_Sanction_Guidelines.pdf (last accessed Mar. 25, 2025).

market. To do so, the Government has created claims whose causes of action are modeled on common law fraud and that provide a type of remedy available only in law courts." *Id*. at 135–36. That made the SEC's case "a common law suit in all but name," *id*. at 136, which means it did "not fall within the [public rights] exception …." *Id*. at 127. Because FINRA alleged the exact same cause of action against Smith, the public rights doctrine cannot displace his right to a jury.

* * *

The right to a jury trial in this case is about more than just constitutional theory, as important as that is. Smith rejects FINRA's accusation that he made material misrepresentations to his investors, either affirmatively or by omission. Smith provided each of the investors with a copy of CSSC's audited financial statements, the accuracy of which has never been questioned, before they made their investment decisions. R. 3419-3451 (CX-202 at 25-57). FINRA, however, concluded that certain other information was misleading. And it said that information was "material"—a sine qua non element of its cause of action—not by evaluating evidence of record, but by consulting its own sensibilities. This is all that was available because its attorneys failed to establish

materiality through the testimony of even one of the four allegedly defrauded investors. None of the four testified that they had been misled in any way by Smith when making their unsecured loans to CSSC. R. at 747-51 (Dept. of Enforcement Witness List). Nor did FINRA attorneys solicit the testimony of any experts to establish materiality. *Id*.

These are all quintessentially questions of fact that, in a constitutionally compliant proceeding, would be decided by a jury. Characterization of evidence, credibility determinations, and the application of common sense to the matter at bar are all functions that the law places in the hands of juries every day. So there is ample reason to suspect that a jury trial, overseen by an Article III court and conducted according to the Federal Rules of Evidence, may have produced a different verdict in Smith's case.

### B. This Case Required an Article III Forum

Even if Smith had not been entitled to a jury, he nonetheless would have been entitled to have his case heard in an Article III forum. There are three reasons this is so: (a) the text of Article III and its history are testament to the Framers' jealous protection of the people's right to have their controversies tried in a tribunal separate and independent from the political branches; (b) although the judicially-created "public rights"

doctrine allows a few matters to be resolved in the Executive Branch, it categorically exempts Smith's case from its operation; and (c) even if the case were not categorically exempt, the few matters to which the public rights doctrine does apply are not implicated here.

### 1. The Necessity of Adjudication in an Independent Branch of Government

Smith's demand to have his case tried before a court in the first instance is not simply a matter of preference. It's a right vouchsafed to him by the Constitution, which says "[t]he judicial power of the United States, shall be vested in one Supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1. Although the separation of powers (of which this vesting clause is a part) is useful in bringing order to governmental functions, its real importance lies in the protection it affords our liberties. As relevant here, it protects citizens' right to have their disputes decided according to the due process of law, not according to whatever opaque processes and influences drive employees of a private company or an Executive Branch agency.

In a welcome embrace of this principle, *Jarkesy* recently reminded us that "'there is no liberty if the power of judging be not separated from

the legislative and executive powers.'" 603 U.S. at 127 (quoting the Federalist No. 78, at 466 (Alexander Hamilton). This is so because, as James Madison said, "[t]he accumulation of all powers legislative, executive and judiciary in the same hands, whether of one, a few or many, ... may justly be pronounced the very definition of tyranny." The Federalist No. 47, at 324 (James Madison) (Jacob Cooke ed., 1961). This is particularly important because, quite often, the facts—all that is truly important—are decided at the trial level: "To experienced lawyers it is commonplace that the outcome of a lawsuit—and hence the vindication of legal rights—depends more often on how the factfinder appraises the facts than on a disputed construction of a statute or interpretation of a line of precedents." *Speiser v. Randall*, 357 U.S. 513, 520 (1958). And that makes "the procedures by which the facts of the case are determined assume an importance fully as great as the validity of the substantive rule of law to be applied." *Id*. at 520–21 (emphasis supplied). Yet what Smith received in vindication of his legal rights was adjudication by a private company and review by an Executive Branch agency.

Whether Smith is entitled to an Article III adjudication is a categorical question; it is not a matter of one's impression of the

importance of the rights at issue. This is why the Supreme Court says, as a constitutional matter, that "the judicial Power of the United States cannot be shared with the other branches." *Jarkesy*, 603 U.S. at 127 (cleaned up). The importance of this arrangement cannot be overstated. Not so many years ago, the Supreme Court observed that "[t]he colonists had been subjected to judicial abuses at the hand of the Crown, and the Framers knew the main reasons why: because the King of Great Britain 'made Judges dependent on his Will alone, for the tenure of their offices, and the amount and payment of their salaries.'" *Stern v. Marshall*, 564 U.S. 462, 483–84 (2011) (quoting The Declaration of Independence ¶ 11). The remedy was Article III, which was specifically devised "to protect citizens subject to the judicial power of the new Federal Government from a repeat of those abuses." *Id.* at 484.

So, the definitive question is whether Congress may remove those protections, under cover of the public rights doctrine, by assigning cases like Smith's to private companies or Executive Branch agencies for resolution. For the following reasons, it may not.

## 2. Smith s Case Is Categorically Exempt from the Public Rights Doctrine

Smith's right to have his case adjudicated in a court, rather than by a private company or the Executive Branch, is an issue of the gravest concern about which the Supreme Court brooks no misunderstanding. "From the beginning we have emphasized one point: 'To avoid misconstruction upon so grave a subject, we think it proper to state that we do not consider [C]ongress can ... withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty.'" *Jarkesy*, 603 U.S. at 132 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 18 How. 272, 284 (1855)). For "[o]nce such a suit is brought within the bounds of federal jurisdiction, an Article III court must decide it, with a jury if the Seventh Amendment applies." *Id*. at 127 (cleaned up; emphasis supplied).

Nonetheless, under the public rights doctrine, there have been instances in which the Supreme Court has allowed Congress to assign the initial adjudication of certain narrowly-defined types of cases to the Executive Branch. The doctrine functions as an exception to the Constitution's textual mandate that no branch but the judiciary may exercise the judicial power of the United States. As *Jarkesy* emphasized,

however, this is an exception, one that, significantly, has no support in the Constitution's text: "The public rights exception is, after all, an exception. It has no textual basis in the Constitution …." *Jarkesy*, 603 U.S. at 131. For that reason, the Court "has typically evaluated the legal basis for the assertion of the doctrine with care," because "[w]ithout such close attention to the basis for each asserted application of the doctrine, the exception would swallow the rule." *Id.*

The starting point for that careful evaluation is the principle that "matters concerning private rights may not be removed from Article III courts." *Id.* at 127. One of the "hallmarks" the Court considers in determining whether a "private right" is at issue is "whether it is made of the stuff of the traditional actions at common law tried by the courts at Westminster in 1789." *Id.* at 127–28 (cleaned up). If it is, "then the matter presumptively concerns private rights, and adjudication by an Article III court is *mandatory*." *Id.* (emphasis supplied).

At this point, the Article III analysis merges almost entirely with that of the Seventh Amendment. The only difference is that, for Article III purposes, the cause of action must have a common-law analog present in 1789, whereas the Seventh Amendment has no such limitation. *See*

*Jarkesy*, 603 U.S. at 122 ("In construing this language [the Seventh Amendment], we have noted that the right is not limited to the common-law forms of action recognized when the Seventh Amendment was ratified.") (cleaned up).

Smith's case belongs in an Article III tribunal because the nature of FINRA's primary claim is of a type "tried by the courts at Westminster in 1789." *Jarkesy* found a "close relationship between the causes of action in this case and common law fraud" because they "[b]oth target the same basic conduct: misrepresenting or concealing material facts." 603 U.S. at 125. And that created "an enduring link between federal securities fraud and its common law 'ancestor,'" *id.*, an ancestry that traces back to 1789 and beyond. 3 William Blackstone, *Commentaries on the Laws of England*, ch. 27 at *431 ("[E]very kind of fraud is equally cognizable, and equally adverted to, in a court of law."). "If a suit is in the nature of an action at common law"—and this one is—"then the matter presumptively concerns private rights, and adjudication by an Article III court is *mandatory*." *Jarkesy*, 603 U.S. at 128 (emphasis supplied).

### 3. None of the Public Rights Exceptions Encompasses Smith s Case

But even if this matter were not categorically exempt from the public rights doctrine, the doctrine still would have no application here. This doctrine is not the rule, it is the exception to the rule that the judiciary alone may exercise the judicial power of the United States. The exceptions must be evaluated with a presumption against the doctrine's application: "[E]ven with respect to matters that arguably fall within the scope of the 'public rights' doctrine, the presumption is in favor of Article III courts." *Id*. at 132. Without that presumption, and the "close attention to the basis for each asserted application of the doctrine," the Court warned, "the exception would swallow the rule." *Id*. at 131. Should that occur—that is, "if the other branches of the Federal Government could confer the Government's 'judicial Power' on entities outside" the courts—then "Article III could neither serve its purpose in the system of checks and balances nor preserve the integrity of judicial decisionmaking[.]" *Id*. at 132.

Justice Gorsuch summarized how the Court currently views the general contours of this atextual doctrine: "[P]ublic rights are a narrow class defined and limited by history. As the Court explains, that class

has traditionally included the collection of revenue, customs enforcement, immigration, and the grant of public benefits." *Jarkesy*, 603 U.S. at 152–53 (Gorsuch, J., concurring) (citing majority opinion). Although the Court has been chary of precisely defining the doctrine's boundaries, one may espy a few recurring themes. So, for example, a long history of committing a matter to executive adjudication, such as collection of revenue, may indicate it is a "public right" inasmuch as there has been "an unbroken tradition—long predating the founding—of using these kinds of proceedings [distress warrants] to 'enforce payment of balances due from receivers of the revenue.'" *Jarkesy*, 603 U.S. at 128–29 (quoting *Murray's Lessee*, 18 How. at 278). So, too, the Constitution's commitment of plenary power over a subject to the political branches might signal an area in which this doctrine may apply, such as immigration, foreign commerce, relations between the Indian tribes, and the administration of public lands. *Id.* at 129–30. And then, of course, there are public benefits—subjects the Court sometimes classes as "public rights" because they had no cognates that pre-existed Congressional action, "such as payments to veterans, pensions, and patent rights[.]" *Id.* at 130 (cleaned up).

None of these exceptions to Article III jurisdiction applies here. The fraud claims FINRA pursued in this case are not within, nor do they resemble, the categories described above. Nor do the claims bear any of the hallmarks the Court has said are potentially indicative of a matter within the doctrine's purview. That is, the Constitution does not confer on the political branches plenary power over causes of action sounding in fraud. Nor is there a long historical tradition of Executive Branch adjudication of this type of claim. Rather, SEC and FINRA adjudication of fraud claims traces back only as far as the Exchange Act, while judicial resolution of fraud claims precedes not just the Constitution, but the country itself.

Because the public rights doctrine categorically excludes the claims against Smith, and none of the narrow exceptions the Court has previously recognized as being within the doctrine's ambit applies, the Constitution required Smith's case to be heard in an Article III court. That means neither FINRA nor SEC had jurisdiction to decide this case.

## CONCLUSION

For these reasons, Smith asks this Court to set aside SEC's Order in its entirety and to direct SEC to enter an order cancelling and setting aside the sanctions imposed against him by FINRA.

March 26, 2025                    Respectfully Submitted,

*/s/ Russell G. Ryan*
Russell G. Ryan
Daniel Kelly
Mark Chenoweth
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Drive, Suite 300
Arlington, VA 22203
(202) 869-5210
russ.ryan@ncla.legal

Robert Knuts
GUNGNIR LAW PLLC
P.O. Box 150
Greenport, NY 11944
(631) 477-6300
rknuts@gungnirlaw.com

*Counsel for Petitioner*

# DESIGNATION OF RELEVANT AGENCY DOCUMENTS

| R. | Description | Page # |
|---|---|---|
| Exchange Act Release No. 100672 | SEC Order (8/19/2024) | JA0001 |
| Exchange Act Release No. 100672 | Opinion of the Commission (8/19/2024) | JA0002 |
| Docket No. 24-3907 | Petition for Review (10/18/2024) | JA0024 |
| FINRA 000059 | Assignment of Hearing Officer (8/8/2017) | JA0050 |
| FINRA 000185-86 | Reassignment of Hearing Officer (10/25/2017) | JA0051 |
| FINRA 000193 | Appointment of Panelists (2/8/2018) | JA0053 |
| FINRA 000209 | Appointment of Panelist (2/26/2018) | JA0054 |
| FINRA 000839-48 | Hearing Transcript Excerpts [pp. 57–66] (6/18/2018) (Testimony re RX-1 and RX-3) | JA0055 |
| FINRA 001171-73 | Hearing Transcript Excerpts [pp. 387–89] (6/19/2018) (Testimony re RX-1 and RX-3) | JA0065 |
| FINRA 002165-67 | Hearing Transcript Excerpts [pp. 1373–75] (6/27/2018) (Testimony re Smith and CSSC-BD) | JA0068 |
| FINRA 003699-796 | Hearing Exhibit (6/18/2018) (RX-1 - Membership application) | JA0071 |
| FINRA 003797-98 | Hearing Exhibit (6/18/2018) (RX-3 - Supplemental submission) | JA0169 |
| FINRA 003799-801 | Hearing Exhibit (6/18/2018) (RX-4 - Approval of membership application) | JA0171 |
| FINRA 003803-04 | Hearing Exhibit (6/18/2018) (RX-5 - Signed membership agreement) | JA0174 |

| FINRA 004133-47 | Post-Hearing Motion to Re-open Record (Proposed Exhibits 82–84) (9/7/2018) | JA0176 |
|---|---|---|
| FINRA 004199-208 | Opposition to Motion to Re-open Record (9/12/2018) | JA0191 |
| FINRA 004209-13 | Order denying Motion to Re-open Record (9/21/2018) | JA0201 |
| FINRA 004219-70 | Extended Hearing Panel Decision (1/2/2019) | JA0206 |
| FINRA 004271-77 | Notice of Appeal (1/28/2019) | JA0258 |
| FINRA 004493-528 | National Adjudicatory Council Decision (9/18/2020) | JA0265 |
| FINRA 004573-75 | Application for Review by SEC (10/19/2020) | JA0301 |

## CERTIFICATE OF COMPLIANCE

This brief complies with Fed. R. App. P. 32(a)(7)(B)(i) because it contains 12,195 words. This brief also complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(4)-(6) because it has been prepared in 14-point Century Schoolbook font using Microsoft Word.

*/s/ Russell G. Ryan*

## CERTIFICATE OF SERVICE

I certify that on March 26, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system. I also certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Russell G. Ryan*